## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**JEFFREY ALLEN**

     **Plaintiff,**

**v.**                                     **Case No. 1:11cv197/MW/CJK**

**CAROLYN W. COLVIN[1]**
**Commissioner of Social Security,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying the claimant's application for disability benefits under Title II of the Act, 42 U.S.C. §§ 401-34, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-83.

_____

[1] Carolyn W. Colvin succeeded Michael J. Astrue as Commissioner of Social Security and is automatically substituted as the defendant. FED. R. CIV. P. 25(d).

Upon review of the record, I conclude that the Commissioner applied the correct legal standards and that his findings of fact and determinations are supported by substantial evidence. The decision of the Commissioner therefore will be affirmed and the claimant's applications for benefits will be denied.

## PROCEDURAL HISTORY

Mr. Allen filed for disability benefits and SSI on January 28, 2008, alleging disability beginning on July 30, 2007.[2] T. 43. His applications initially were denied; the denial was upheld on June 25, 2008. T. 51, 54. Mr. Allen filed a request for hearing on July 14, 2008. His request was granted, and a hearing was conducted on December 21, 2009, in Ocala, Florida. T.29-42. On January 28, 2010, the administrative law judge ("ALJ") found that Mr. Allen was not disabled as defined by the Act. T.13. Mr. Allen requested review by the Appeals Council, which denied his request on July 19, 2011. T. 1. Mr. Allen thus instituted this action, challenging the Appeals Council's decision in that regard.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made the following findings relevant to the issues raised in this appeal:

- The claimant has the following severe impairments: hypertension; hyperlipidemia; gastroesophageal reflux disease; diabetes mellitus, type 2; and affective disorder.

---

[2] The administrative record, as filed by the Commissioner, consists of nine volumes (doc. 8-1 through 8-9), and has 324 consecutively numbered pages. References to the record will be by "T." for transcript, followed by the page number.

Case No. 1:11cv197/MW/CJK

•    The claimant has the residual functional capacity ("RFC") to perform low stress (non-production oriented), simple work with indirect contact with the public, supervisors, and co-workers. He is able to lift and carry twenty pounds occasionally and ten pounds frequently, sit for six hours in an eight-hour workday, and push and pull with his upper and lower extremities within the aforementioned weight restrictions. He can occasionally bend, stoop, balance, crouch, and crawl and has no manipulative, visual, communicative, or environmental limitations.

•    The claimant is capable of performing past relevant work as an assembler of gun casings, which does not require performance of work-related activities precluded by the claimant's RFC.

T. 16-24.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). When reviewing the legal principles upon which the Commissioner's decision is based, the court conducts a *de novo* review. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). When reviewing the resulting decision, however, the court determines only whether it is supported by substantial evidence. *See id.* Substantial evidence is "'such relevant evidence as a reasonable person would accept

Case No. 1:11cv197/MW/CJK

as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" and instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Thus, while review of the resulting decision is deferential to a point, the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d. 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[3]

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision as to whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 11th Cir. 2002).

Case No. 1:11cv197/MW/CJK

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do his previous work, but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[4] *Id.* at § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

---

[4] Here, the claimant seeks both disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, and SSI under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83. For purposes of determining whether a claimant is disabled, the law and regulations governing a claim for disability benefits are identical to those governing a claim for SSI benefits. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986). All references to statutes and rules in this order will be to those addressing disability benefits.

4.  If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.  Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that prevents him from performing his past work. *See* 20 C.F.R. § 404.1512.

FACT BACKGROUND AND MEDICAL HISTORY

Mr. Allen testified at a hearing on December 21, 2009.  T. 29.  He confirmed that he previously worked at a gun casing manufacturer, polishing chokes and "do[ing] anything they need[ed him] to do."  He was required to lift no more than twenty pounds.  He testified that he was fired from his job because stomach and breathing issues hindered his ability to report to work consistently; he also had difficulty getting along with his co-workers.  T. 35-39.  Since his termination, the claimant has spent the majority of his days on the computer and watching television, which he is able to do without interruption other than to go to the restroom.  T. 41.  Mr. Allen has problems with his memory. T. 41.

In August 2004, Mr. Allen saw Kerry Henderson, M.D., complaining of neck pain.[5]  T. 175-77.  He reported waking up feeling "light headed, somewhat dizzy and having neck and back pain."  T. 175.  He developed an "occipital headache that

---

[5] Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as called for in the Analysis section.

Case No. 1:11cv197/MW/CJK

radiated forward." T. 175. Mr. Allen denied fever, chills, blurred vision, and nausea, but reported a history of back and neck spasms. T. 175. He confirmed that he previously was prescribed Prozac. T. 175. Mr. Allen was released with prescriptions for ibuprofen, Robaxin, and Lortab, with no refills. T .177. Nine months later, in May 2005, the claimant was admitted to North Florida Medical Center for chest pains; he was treated by George Cockey, M.D. T. 178. Mr. Allen described the pain as "being hit across the border of his chest." T. 178. He reported having some left arm numbness as well. T. 178. The symptoms gradually resolved, particularly after the claimant was given Nitroglycerin and Plavix. T. 178.

Lance Chodosh, M.D., examined Mr. Allen at the request of the Division of Disability Determinations. T. 193. Dr. Chodosh noted that while Mr. Allen claimed to have difficulty breathing, the problem had not been medically evaluated. T. 193. Claimant denied coughing or wheezing, but reported decreased exertional capacity. T. 193. He claimed to experience severe daily headaches with photophobia which were relieved by taking naps. T. 193. Mr. Allen denied any nausea or vomiting. T. 193. He also reported prior treatment for bipolar disorder after having attempted suicide twice when he was thirty years old. T. 193. Dr. Chodosh noted that the claimant had slightly elevated blood glucose readings, which previously were thought to be indicative of borderline diabetes. T. 193. He also mentioned that Mr. Allen had difficulty stooping because of excessive weight. T. 194. Dr. Chadosh opined that Mr. Allen most likely suffered from a psychological or psychiatric disorder but noted a lack of physical evidence of a physical impairment. T. 196. Dr. Chadosh observed that the claimant was able to stand, walk, sit, stoop, kneed, lift, carry, see, and speak normally. T. 196.

Case No. 1:11cv197/MW/CJK

In December 2006, Mr. Allen was referred to Tracey Cooper, Ph.D., a licenced psychologist at Community Behavioral Services, for a general clinical evaluation to assess his level of functioning. T. 198. During the evaluation, the claimant reported a history of bipolar disorder, depressive disorder, and decreased memory abilities; he denied having had a head injury. T. 198. Mr. Allen stated that his most recent job was building boats in 2005. He initially indicated that he was terminated from that job because he could not maintain company standards; he then explained that he was terminated because of anger problems. T. 199. Mr. Allen further indicated that he was divorced and had three children but no parental rights. He reported a criminal history consisting of multiple sexual offenses, including one involving a fourteen year old girl, and at least one period of incarceration. T. 199. He denied a history of substance abuse. Dr. Cooper noted no obvious impairments in the claimant's vision, hearing, or speech abilities and reported that the claimant's processing abilities appeared slowed but that the claimant exhibited "appropriate judgment abilities as well as . . . appropriate verbal reasoning abilities." Dr. Cooper concluded that the claimant was functioning in the low average range of intelligence and diagnosed him with pedophilia and personality disorder NOS with antisocial traits. She assigned him a Global Assessment of Functioning ("GAF") of 60 and opined that his "current level of functioning would probably not preclude him from obtaining employment," although he might have difficulty maintaining employment.[6] T. 200.

---

[6] A GAF between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. The American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (4th ed. 1994). However, the most recent edition of the Diagnostic and Statistical Manual no longer recommends use of the GAF scale, acknowledging that "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric

In March 2007, Mr. Allen underwent a cardiac ultrasound at Nature Coast Regional Hospital after complaining of dizziness and shortness of breath. T. 208. The test was performed by Jeremy Havas, D.O., and did not reveal any evidence of significant hard or soft plaque, stenosis, or pleural effusion. T. 208. Havas found that Mr. Allen's heart was within normal limits. T. 209. Almost one year later, in February 2008, the claimant was interviewed by telephone for a disability report. T. 109. The interviewer reported that Mr. Allen had no difficulty with understanding, coherency, concentration, talking, or responding to questions. According to the interviewer, Mr. Allen claimed that his bipolar disorder, obesity, depression, and anxiety limited his ability to work and that he was unable to function because of dizziness and shortness of breath. T. 111, 114. Notably, however, Mr. Allen had not sought treatment for the conditions. T. 114.

In March 2008, Mr. Allen again was examined by Dr. Chodosh at the state's request. T. 218. At that time, the claimant reported shortness of breath when walking thirty feet and dizzy spells that caused him to feel as if "someone [was] sitting on [his] chest." T. 218. He reported being diagnosed with diabetes two years earlier, but there was no indication that he suffered any complications as a result of or took any medication for the condition. T. 218. Dr. Chodosh observed that the claimant was obese, weighing 312 pounds, and continued to gain weight. T. 219. He noted that Mr. Allen's breathing pattern was prominent but "not truly labored." T. 220. He diagnosed the claimant with obesity, exertional dyspnea "almost certainly due to obesity," and nonspecific chest discomfort. He opined that the claimant was able to

---

Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 16 (5th ed. 2013).

stand for six hours and walk for four hours in an eight-hour day. T. 221. He also opined that the claimant could stoop, squat, kneel occasionally, lift forty pounds, and carry thirty pounds occasionally. T. 221. Dr. Chodosh recommended that the claimant undergo a mental assessment. T. 221.

The claimant completed a function report in March 2008 in which he indicated that, on a normal day, he would "get up and dressed, watch tv/play video games, eat lunch, watch tv/play video games, take a nap, eat dinner, watch tv/play video games, sleep."[7] T. 119, 120. Claimant stated that he took care of his animals, played card games, and visited family members twice a week. T. 120-23. He completed some household chores, such as taking out the trash, laundry, and grocery shopping, and was able to pay bills and count change. T. 121, 122. He reported that he needed help getting his socks and shoes on, but otherwise was able to dress and groom himself without assistance, although he needed reminders to take his medication. T. 120. He stated that he needed to have a fan on while sleeping because he occasionally stopped breathing during his sleep. T.120. He reported difficulty lifting, bending, walking, climbing stairs, and completing tasks and complained of light headedness upon physical exertion. He denied having problems with his memory or ability to concentrate, stating that he was able to pay attention "as necessary." T. 124. He indicated that he was diabetic, obese, took Effexor for stress headaches and stress-related conditions, and had severe heartburn. T. 126. When asked to describe his pain symptoms on a separate questionnaire, Mr. Allen noted mild chest pain, severe and frequent headaches, and difficulty breathing. T. 127. He claimed that these

---

[7] According to the claimant, he is "real good" at watching tv and playing computer/video games. T. 123.

symptoms resulted from "bending, walking, carrying things and temperature extremes" but lasted for only fifteen to twenty minutes daily.  T. 127.  When asked to explain the manner in which his pain prevented him from performing his daily activities, Mr. Allen claimed that he had to stop to catch his breathe while shopping, could not do yard work, and was unable to perform home maintenance.  T 128.  He denied that his pain stopped him from driving, cooking, caring for himself, cleaning his house, and doing laundry.  T. 128.

Mr. Allen met with William Beaty, Ph. D., in April 2008 for further mental evaluation.  T. 231.  Claimant was able to drive himself to the appointment.  T. 231.  Despite having previously denied a head injury, Mr. Allen claimed to have been in a car accident in which he hit his head on the windshield and suffered memory loss.  T. 232.  He also indicated that he had suffered from panic attacks for the past fifteen years.  T. 232.  He acknowledged that he was prescribed Effexor, but stated that he stopped taking it for financial reasons.  T. 232.  Dr. Beaty observed that the claimant seemed depressed but had adequate concentration and mental controls.  T. 232.  He reported that claimant had some difficulty with short- and long-term  memory and understanding instructions but noted that the claimant nevertheless was able to play video games for long periods of time.  T. 232-33.  According to Dr. Beaty, the claimant took "little initiative in his life or responsibility for his own health or well being."  He diagnosed the claimant with dysthymic disorder, early onset, and dependent personality disorder.  T. 233.

In April 2008, the claimant completed a form regarding his heart problems.  T. 130.  He denied having had a heart attack, but stated that he had been admitted to Northern Florida Regional Medical Center in 2007 for anxiety.  T. 130.  When asked

to describe the manner in which his heart condition prevented him from working, Mr. Allen failed to respond; he noted, however, that he could walk only half a block slowly and fifty feet rapidly and could climb only fifty steps before becoming "dizzy." T. 131. Mr. Allen stated that he could lift and carry up to thirty pounds. T. 131. When asked about the chest discomfort, he described the feeling as "pressure, shortness of breath, sticking, burning and weight on my chest" and indicated that the discomfort began in the middle of his chest and moved to his arm. T. 132. He stated that he experienced the symptoms frequently but had not had any symptoms not in the past month. T. 132.

On an Initial/Reconsideration Worksheet dated April 2008, claim adjudicator Ernest Dealing stated that "the combination of impairments does impact on the claimant's physical/mental functional capacity" but that "the claimant can perform a sufficient number of jobs in view of his vocation profile." Dealing thus denied Mr. Allen's claim. T. 135. The same month, Michael Zelenka, Ph.D., a state Disability Determination Services ("DDS") psychologist, completed a mental assessment of the claimant. T. 234. He diagnosed the claimant with affective disorder, personality disorder, and dysthmia and concluded that the claimant was mildly restricted in the activities of daily living and had moderate difficulty maintaining social functioning, concentration, persistence, or pace. T. 234, 244. Dr. Zelenka also conducted a mental RFC assessment of the claimant and found that he was "not significantly limited" in most areas but was moderately limited in the following areas: "[t]he ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to complete a normal workday without interruption from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number of rest periods, and the ability to interact appropriately with the general public." T. 248-249. Dr. Zelenka found no support for a diagnosis of bipolar disorder and concluded that the "claimant [was] able to carry out simple instructions and relate minimally adequately to others in a routine work setting." T. 249.

Also in April 2008, the claimant underwent a spirometry (pulmonary function) test, which revealed a slightly deceased FEF25-75, indicating that the claimant suffered from small airway disease due to emphysema from smoking. T. 256. The claimant nevertheless had "generally normal lung function." T. 256. The following month, Nicholas Banks, M.D., a DDS physician, conducted a physical RFC assessment of the claimant. T. 257. Dr. Banks found that the claimant could occasionally "lift/carry 20 pounds and frequently lift/carry 10 lbs" and could "stand/walk for about 6 hours, and sit for about 6 hours in an 8-hour workday." T. 258. Dr. Banks further noted that the claimant could "push/pull an unlimited amount," only occasionally balance, and could frequently stoop, kneel, crouch, crawl, and climb steps. T. 258-59.

Mr. Allen filed a Disability Report Appeal form in June 2008, in which he reported no changes and no new physical or mental limitations. T. 140. He denied having consulted any medical professionals about his conditions or having any plans to do so. T. 141. He also denied working since his last disability report. T. 142. That same month, the claimant had a second mental RFC assessment with Steven Wise, Psy.D., who concluded that the claimant was not significantly limited in most areas, but was moderately limited in the following areas: "the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to

complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods, the ability to interact appropriately with the general public, and the ability to set realistic goals or make plans independently of others." T. 265-67. Dr. Wise noted that these impairments would not hinder the claimant from carrying out simple tasks or maintaining concentration and attention for routine uncomplicated tasks for two hour periods. T. 267. The same day, Eric Puestow, M.D., a DDS physician, completed a physical RFC assessment on claimant. T. 284. Dr. Puestow found that the claimant could "occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, push and/or pull unlimited other than as shown for lift/carry" and "sit, stand or walk for up to 6 hours in an 8-hour workday." T. 284. Dr. Puestow also found that the claimant's purported symptoms were "poorly supported by the data." T. 288.

Adjudicator Susan Roche completed an Adult Initial/Reconsideration Decision Worksheet in June 2008. In the worksheet, Roche noted that there were allegations or reports that Mr Allen experienced symptoms severe enough to interfere with his daily functioning. T. 145. She found that the claimant's impairments did not impact his physical/mental functional capacity but that he could not perform his past relevant work due to limitations in RFC. T. 145-46. She nevertheless concluded that the claimant was not disabled and could perform a number of jobs, including as a router, checker, and mailer. T. 147.

In July 2008, claimant was examined by Christopher Forsmark, M.D., a gastroenterologist, for complaints of abdominal pain and frequent incontinence over the past year. T. 303. Dr. Forsmark ordered an endoscopy and gastric emptying studies and recommended a follow-up visit in eight weeks. T. 304. The claimant

filed a second Disability Report Appeal form in September 2008, in which he indicated that he began experiencing "stomach problems" in January 2008, consisting of "pain in the stomach after eating, diarrhea, and vomiting." T. 153. Claimant denied working since his last disability report and stated that he engaged in less physical activity. T. 155-56. The claimant visited Dr. Forsmark again in October 2008, at which time he reported chronic daily nausea and abdominal pain. T. 301. An upper endoscopy showed "mucosal changes suggestive of short segment Barrett's esophagus." T. 301. Dr. Forsmark recommended a colonoscopy with biopsies, stool studies, and gastric emptying; he also prescribed Omeprazole and recommended that the claimant lose weight and reduce meal sizes. T. 302.

Claimant was referred to Eric Paipernaik, D.O., in November 2008. Paipernaik noted that the claimant claimed to be diabetic but had no documentation of the initial diagnosis. T. 321. He also noted that the gastric-emptying study produced "normal" results and that two polyps were found and resected during the colonoscopy. T. 296, 299. Claimant was prescribed blood pressure medication. A couple of months later, in January 2009, the claimant visited James M. Smith, M.D., who noted that he was doing "reasonably well." T. 317. Claimant's blood pressure had improved and his headaches were being effectively treated with Metformin. T. 317. Mr. Allen reported that his bowel movements were stable and that his abdominal pain had ceased. T. 317. Dr. Smith prescribed the claimant Hydrochlorothiazide and Pracastatin. T. 317. The claimant saw Dr. Smith again in March 2009, at which time he complained of headaches and incontinence "with increase of intra-abdominal pressure such as with coughing." T. 315. Dr. Allen advised the claimant to discontinue Pravachol for two weeks to see if his diarrhea improved. T. 315. He also suggested fiber

supplementation. T. 315.  During a follow-up visit in May 2009, Dr. Smith noted that the claimant was experiencing stress  due to "difficulty keeping up with expenses" and was "feeling depressed" as a result. T. 313.  Claimant's blood pressure was "under good control" but his blood glucose levels were high.  T. 313.  Dr. Smith prescribed the claimant Fluoxetine for depression and again suggested that he increase his fiber intake.  T. 314.  The claimant visited Dr. Smith again in September 2009 and reported headaches, difficulty sleeping, leg discomfort, and continued diarrhea.[8] T. 309.  His blood sugar levels were "pretty good," his diabetes was "under decent control," and his depression and diarrhea were "relatively stable" with medication.  T. 309-10.  Dr. Smith ordered a sleep study and advised claimant to continue taking fiber.  T. 310.

<u>ANALYSIS</u>

Based on the claimant's medical history and evaluations by DDS physicians, the ALJ determined that the claimant had the RFC to perform his previous duties as a gun casings assembler.  T. 22.  The claimant maintains that the ALJ erred in that regard because he failed to include the limitations identified by Drs. Zelenka and Wise during the psychiatric review techniques ("PRT") and failed to adequately weigh the opinions of Drs. Beaty, Chodosh, and Ables, all of whom allegedly diagnosed him with mental disorders, in assigning his mental RFC.  T.250, 267.  According to the claimant, the diagnoses of Drs. Beaty, Chodosh, and Ables establish that he suffers from severe mental impairments that should have been factored into the RFC.

---

[8] That was the claimant's last documented medical appointment. T. 309.

Case No. 1:11cv197/MW/CJK

With regard to the claimant's first assignment of error, PRT assessments are used at steps two and three of the sequential evaluation process to determine the severity of a claimant's mental impairments and whether the claimant has a listed impairment. *See* 20 C.R.F. §§ 404.1520a(c)(3), 416.920a(c)(3). In this case, the ALJ found at step two that the claimant had a severe mental impairment and, at step three, that he did not have a listed impairment. T.18. The claimant argues, based on *Winschel v. Astrue*, 631 F.3d 1176 (11th Cir. 2011), that the ALJ should have considered his PRT limitations when determining RFC at step four.

In *Winschel*, the Eleventh Circuit addressed whether a hypothetical question posed to a vocational expert at step five must specifically account for limitations identified during the PRT. The court held that the ALJ in that case should have explicitly included the claimant's limitation in the hypothetical question because the question utilized did not indicate that the claimant was able to work despite his limitation or otherwise implicitly account for the limitation.[9] *Id.* at 1181. The undersigned finds the claimant's reliance on *Winschel* misplaced for several reasons. First, because the ALJ in this case found that the claimant was capable of performing his past relevant work, he was not required to proceed to step five or obtain the

---

[9] According to the Eleventh Circuit, while an ALJ generally does not "account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work," that is not the case "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace." *Id.* at 1180. In the latter case, "courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *Id.*

Case No. 1:11cv197/MW/CJK

testimony of a vocational expert.[10]  This case, therefore, is materially distinguishable from *Winschel*.  Second, contrary to the claimant's allegations, the ALJ considered the claimant's PRT limitations in calculating RFC.  As set forth above, at step three, the ALJ found that the claimant had a severe mental impairment; and at step four, the ALJ gave "particular consideration to the claimant's . . . mental disorders."  He nevertheless concluded, based on the medical evidence, that the claimant did not have a listed impairment.  Third, the ALJ found that the claimant could "perform low stress (non-production oriented), simple [work] with indirect contact with the public" despite his limitations in concentration, persistence, and pace.  Thus, even if *Winschel* applied, it would not require the ALJ to specifically account for the claimant's PRT limitations.

Turning to the claimant's second assignment of error – the ALJ's alleged failure to adequately weigh the opinions of Drs. Beaty, Chodosh, and Ables – the court again finds the argument unavailing.  As the claimant points out, Dr. Beaty diagnosed dysthymic disorder, dependent personality disorder, and a learning disorder, each of which, alone or in combination, could affect his RFC.  "The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary."  *Russell v. Astrue*, 331 Fed.

---

[10] As the Eleventh Circuit explained in *Winschel*, "[a]t step five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform."  *Id.* at 1180.  "An ALJ may make this determination either by applying the Medical Vocational Guidelines or by obtaining the testimony of a vocational expert."  *Id.*  "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  *Id.* (internal marks omitted).

Case No. 1:11cv197/MW/CJK

Appx. 678, 681 (11th Cir. 2009) (internal marks omitted). It is not unlawful, however, "to discredit the opinion of an examining or treating physician, so long as the Commissioner specif[ies] what weight is given to a treating physician's opinion and any reason for giving it no weight . . . ." *Id.* (internal marks omitted). In this case, the ALJ clearly explained his reasoning for disregarding Dr. Beaty's assessment. Specifically, the ALJ explained that he assigned "little weight" to Dr. Beaty's opinion because Dr. Beaty "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." T. 19. According to the ALJ, the claimant's subjective complaints were suspect. Specifically, the ALJ found that although the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, the claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms were not fully credible to the extent they were inconsistent with his RFC. The ALJ also noted the claimant's criminal record and the fact that he reported to the consultative examiners several different versions of how he was injured and that he alleged unsubstantiated psychological disorders, all of which caused the ALJ to question the veracity of the claimant's reports of impairment. Contrary to the claimant's argument on this issue, the court finds that the ALJ articulated specific and adequate reasons for discrediting the claimant's subjective complaints. The court thus finds that the ALJ applied the correct legal standard and that his decision regarding the weight to be assigned to Dr. Beaty's opinion was supported by substantial evidence.

Finally, although the claimant contends that the ALJ erred in failing to adequately weigh the opinion of Dr. Chodosh, the ALJ assigned Dr. Chodosh's

opinion "great weight." Indeed, the ALJ found Dr. Chodosh's opinion to be "well supported by other objective medical evidence including the laboratory and diagnostic findings of record." Although Dr. Chodosh noted that the claimant likely suffered from a psychological or psychiatric disorder, he did not find the plaintiff to be impaired as a result of such a disorder. Rather, he stated that a "[s]eparate psychological assessment [was] indicated." T. 196. The ALJ also afforded "[g]reat weight" to Dr. Abeles' opinion, which he found to be supported by Dr. Chodosh's opinion, the state agency examiner's opinion, and the other evidence of record. Although Dr. Abeles noted that the claimant "appeared to meet the criteria for a Personality Disorder as well as Pedophilia," she concluded that his "current level of functioning would probably not preclude him from obtaining employment," although he might have difficulty maintaining it. Considering the claimant's "personality organization," Dr. Abeles gave him a "fair" prognosis for future success in the workplace." Not only did the ALJ expressly assign great weight to the opinions of Drs. Chodosh and Abeles, therefore, but the ALJ's findings were consistent with those of the doctors.

Based upon the foregoing analysis, the court finds that the ALJ complied with the applicable legal standards in rendering his decision in this matter and that his decision was supported by substantial evidence.[11] *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). It is therefore respectfully RECOMMENDED:

---

[11] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Moore*, 405 F.3d at 1211.

Claimant's applications for disability benefits and Supplemental Security Income be DENIED and the Commissioner's decision be AFFIRMED.

At Pensacola, Florida, this 23rd day of August, 2013.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).

Case No. 1:11cv197/MW/CJK